NO. 4-99-0951

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

          Plaintiff-Appellee,

          v.

DARREN RANSOM,

          Defendant-Appellant.

)

)

)

)

)

)

)

)

   Appeal from

   Circuit Court of 

   Sangamon County

   No. 99CF596

   Honorable

   Donald M. Cadagin,

   Judge Presiding.

______________________________________________________________

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In June 1999, the State charged defendant, Darren Ransom, with attempt (murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 1998)), home invasion (720 ILCS 5/12-11(a)(1) (West 1998)), and armed robbery (720 ILCS 5/18-2(a) (West 1998)).  In September 1999, a jury found defendant guilty of all counts.  In November 1999, the trial court sentenced him to 15 years in prison for home invasion, 20 years for armed robbery (to run consecutively to the home invasion sentence), and 35 years for attempt (to run concurrently with the armed robbery and home invasion sentences).   On appeal, defendant argues that (1) the trial court erred by (a) denying his motion 
in
 
limine
 seeking to bar the State from introducing evidence of his flight and (b) admitting certain evidence; (2) the prosecutor made improper statements during closing argument; and (3) section 5-8-4(a) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-8-4(a) (West 1998)) is unconstitutional under 
Apprendi v. New Jersey
, 530 U.S. ___, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).  We affirm.

I. BACKGROUND

The evidence at defendant's jury trial showed the following.  On the night of May 15, 1999, the victim, Donna Hill, was out with her friend, Alexis Bell.  At 11:30 p.m., Donna returned to her home, which she shared with her mother, Denise Wilborn, her brother, Carl Hill, and her three sons.  Her mother and youngest son were the only ones at home when she arrived.  Around midnight, Wilborn invited Dewayne Bias and his sister, Diane, into the home to visit with Donna.  Wilborn then went next door to a friend's house.  Dewayne and Diane stayed for about 15 minutes.  Around 3 a.m., Bell honked the horn of her car in front of the home, and Donna talked to Bell out of her bedroom window for about 15 minutes.

Around 4 a.m., Donna's baby became fussy, and Donna started downstairs to prepare a bottle.  Halfway down the stairs, she heard someone come in the front door.  When she got to the living room, she saw defendant with one foot in the living room and one on the porch.  Donna recognized defendant because he had been at her home several times in the previous weeks to see Wilborn, who braided his hair.  A week before, Donna and defendant had argued at Donna's home, and she told defendant not to come there again.  

Donna asked defendant to leave, and he left.  She closed the door but did not lock it.  After fixing the bottle, she returned to her bedroom, fed the baby, and put him in bed.  Donna then got undressed and lay down on her bed to watch television and count her rent money.  As she was counting the money, she heard someone coming up the stairs.   

Donna then saw defendant and another man, whom she did not recognize, standing at her door, and she asked defendant to leave.  Defendant had a hammer in his hand.  Carl testified that a day before the incident, he and his cousin, Shantel Williams, had used a hammer to install a door on Donna's bedroom and had left it on the floor nearby.  Defendant attacked Donna with the hammer, first striking her on the side of her face and then on her forehead.  As she lost consciousness, the money fell out of her hands.  

When she regained consciousness, Donna went to her bedroom window and yelled for help.  She then crawled down the stairs and tried to leave the house.  She made it to the kitchen, where she lost consciousness again.  

Later that morning, Donald McClain, a former boyfriend of Donna and the father of her oldest child, entered the home and found Donna lying in the kitchen.  He then went to his cousin's house where he called 911.       

When Springfield police detective James Young, an evidence technician, arrived on the scene, he found blood on the bed and walls of Donna's bedroom that continued in a path to the kitchen, where a considerable amount of blood had collected on the floor and walls.  Young also found Donna's purse in the bedroom and its contents strewn on the floor.  The hammer was never found.

During the night of May 15, 1999, and the early morning of May 16, James Jones and Monte Turner were at Mac's Lounge with defendant.  Around 1 or 1:30 a.m., Jones could not find defendant.  Jones and Turner left the lounge and returned to their home.  When Jones entered the home, he placed his car keys on top of his entertainment shelf.  

Around 8 a.m., Jones and Turner were awakened by defendant, who was knocking on the window and calling Jones' name.  Turner testified that defendant knocked on the window and repeated "let me in" in a "panicky, rushing, [and] hurrying" manner for 5 or 10 minutes.  Eventually, Turner opened one door and asked defendant what he wanted.  Defendant offered $20 if someone would open the door.  Turner opened a second door and let defendant inside.  Jones and Turner did not notice any blood on defendant.  Defendant, carrying a black gym bag, asked Jones if he could drop defendant off at defendant's father's house and offered him another $20.  Jones denied defendant's request, and he and Turner went back to sleep.  Turner described defendant as panicky, jumpy, and nervous that morning.  

At 9:30 a.m., Turner's brother stopped by Jones and Turner's home to drop their child off and mentioned that Jones and Turner's car was gone.  Jones and Turner then noticed that the keys were missing from the entertainment shelf.  Approximately one week later, the car was found in St. Louis, Missouri.  When it was returned, the car did not contain any blood or tools.

On May 23, 1999, a St. Louis police officer arrested defendant, and in June 1999, the State charged him as stated.  Before trial, defendant filed a motion 
in
 
limine
 seeking to prohibit the State from offering any evidence of his flight.  The trial court denied the motion, finding sufficient circumstantial evidence of defendant's flight.

At trial, the State sought to use a hammer similar to the one used in the attack to illustrate that Donna's injuries were consistent with those a hammer would cause.  The trial court overruled defense counsel's objection to the use of the hammer.

The State also sought to show how Donna initially identified defendant by using a book of mug shots, which contained arrest photographs of defendant and other individuals.  Defense counsel made a motion 
in
 
limine
 to prohibit the State from introducing the mug shot book.  The trial court denied the motion.  However, the court directed the State not to refer to the book as a "mug book" or "police book" and ruled that the book would not go back to the jury during deliberations.

Defense counsel made another motion 
in
 
limine
 to prohibit the State from introducing evidence that Donna became physically ill upon seeing defendant's photograph.  The trial court denied the motion, stating that the police officers could testify to what they observed when Donna saw the photograph. 

At the trial's conclusion, the jury found defendant guilty of all counts.  Defendant subsequently filed motions for merger and a new trial.  Following a sentencing hearing, the trial court denied defendant's motion for a new trial but never ruled on the merger motion.  The court then sentenced defendant as stated.  This appeal followed.

II. ANALYSIS

A. Evidence of Flight

Defendant first argues that the trial court erred by denying his motion 
in
 
limine
 seeking to prohibit the State from introducing evidence of his flight.  Specifically, he asserts that no evidence showed or raised the inference that defendant knew he was a suspect in a crime or that the police were pursuing him.  We disagree.

Evidentiary rulings lie within the trial court's sound discretion, and this court will not disturb them unless the trial court abused its discretion.  
People v. Boclair
, 129 Ill. 2d 458, 476, 544 N.E.2d 715, 723 (1989).  The fact of flight is a circumstance that a jury may consider as tending to prove guilt.  
People v. Lewis
, 165 Ill. 2d 305, 349, 651 N.E.2d 72, 93 (1995).  The inference of guilt that may be drawn from flight depends upon the suspect's knowledge that (1) the offense had been committed, and (2) he is or may be suspected.  
Lewis
, 165 Ill. 2d at 349, 651 N.E.2d at 93.  Although evidence that a defendant was aware that he was a suspect is essential to prove flight, actual knowledge of his possible arrest is not necessary to render such evidence admissible where evidence exists from which that fact may be inferred.  
Lewis
, 165 Ill. 2d at 350, 651 N.E.2d at 93.  

The State's evidence of flight consisted of Turner's testimony that a few hours after the May 16, 1999, incident, defendant was at her home in a panicked state, trying to get a ride.  Defendant offered Turner $20 to enter her home and offered Jones $20 for a ride.  After Jones refused to give defendant a ride, his car keys and car turned up missing.  The car was later found in St. Louis, where defendant was arrested.  Moreover, the evidence showed that defendant would be motivated to flee because he had attacked a person who knew him and could identify him.

We conclude that based on the evidence presented, the jury reasonably could have inferred that defendant knew that he was a suspect and he consciously avoided police.  We therefore hold that the trial court did not err by denying defendant's motion 
in
 
limine
.

B. Other Evidence

Defendant next argues that the trial court erred by allowing the State to (1) present testimony regarding (a) the book of mug shots and (b) Donna's becoming physically ill when she viewed defendant's photograph, and (2) use a hammer as demonstrative evidence.  For the following reasons, we disagree.    The admissibility of evidence at trial lies within the trial court's sound discretion, and we will not overturn its decision absent a clear abuse of discretion.  
People v. Illgen
, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991).    

1. 
The
 
Book
 
of
 
Mug
 
Shots

Defendant contends that the State's presentation of evidence regarding the book of mug shots was prejudicial.  We disagree.  

At trial, Donna identified defendant's photograph in the book and identified the book as the one police showed her when she was in the hospital following the incident.  However, the trial court did not allow the State to refer to the book as either a "mug book" or a "police book."  Instead, the State referred to it as a "photo book."  See 
People v. Ayers
, 264 Ill. App. 3d 757, 759, 636 N.E.2d 600, 601-02 (1993) (trial court did not abuse its discretion in allowing mention of "photos," "photographs," and "photo books" while admonishing the State not to refer to the defendant's prior arrest photo as a "mug shot" or "mug photo").  Further, the court did not allow the book to go back to the jury room during deliberations.  

Contrary to defendant's contention, the State did not use the book to suggest that he committed the instant crime because he had been previously arrested.  Instead, the trial court took appropriate measures to prevent such prejudice from occurring.  We therefore conclude that the court did not err by admitting this evidence.  

2. 
The
 
Hammer
 
as
 
Demonstrative
 
Evidence

Defendant next argues that the trial court erred by permitting the State to use a hammer as demonstrative evidence.  Specifically, he contends that the use of the hammer was (1) unnecessary because a hammer is a "familiar object" and (2) inflammatory.  

In 
People v. Burrows
, 148 Ill. 2d 196, 252, 592 N.E.2d 997, 1022 (1992), the Supreme Court of Illinois wrote the following on the use of demonstrative evidence:

"Courts look favorably upon the use of demonstrative evidence, because it helps the jury understand the issues raised at trial.  'The overriding considerations in admitting demonstrative evidence are relevancy and fairness.  [Citations.]  The question of the admissibility of such exhibits is a matter within the trial court's discretion and will be disturbed only on a showing of clear abuse.'[Citation.]"  

Here, the State's expert witness testified that Donna's injuries were consistent with those that would result from blows inflicted by a hammer similar to the one the State presented.  This testimony might have laid to rest any doubts the jury held regarding whether Donna's description of the attack was consistent with the injuries she received.  Given the other extensive and sometimes gruesome evidence of the brutality of the attack and the injuries Donna suffered, we hold that the State's use of the hammer as demonstrative evidence was not so inflammatory as to unfairly prejudice defendant and the trial court did not abuse its discretion by allowing it. 

3. 
The
 
Victim's
 
Reaction
 
to
 
Defendant's
 
Photograph

Defendant next asserts that the trial court erred by admitting evidence that Donna became physically ill after viewing defendant's photograph.  Specifically, he claims this evidence was not relevant.  We disagree.  

Evidence is relevant if it tends to make the existence of any fact that is of consequence to the determination of the case more probable than it would be without the evidence.  
Lewis
, 165 Ill. 2d at 329, 651 N.E.2d at 83.  However, even when evidence is relevant, the trial court may, in its discretion, exclude it if its prejudicial effect substantially outweighs its probative value.  
Lewis
, 165 Ill. 2d at 329, 651 N.E.2d at 83. 

The evidence of Donna's reaction to the photograph was highly probative of the identity of the attacker in that her violent reaction makes it more probable that the person in the photograph was her attacker.  Accordingly, we conclude that the trial court acted within its discretion by admitting the evidence of Donna's reaction to defendant's photograph.

C. Prosecutor's Statements in Closing Arguments

Defendant next argues that the prosecutor made improper statements during closing argument.  We disagree.  

A prosecutor is allowed a great deal of latitude in closing argument and may comment on the evidence presented and on reasonable inferences arising therefrom, even if those inferences are unfavorable to the defendant.  
People v. Hudson
, 157 Ill. 2d 401, 441, 626 N.E.2d 161, 178 (1993).  Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of a given remark, determining the permissible scope of closing argument lies within the trial court's discretion, and we will not disturb that determination unless a clear abuse of discretion occurred.  
Hudson
, 157 Ill. 2d at 441, 626 N.E.2d at 178.

During closing arguments, the prosecutor made the following statement:

"This isn't a case of maybe I'm mistaken about who he is.  She knows specifically who he is[,] and she pointed to him[,] and she knows that is who he is.  For her to point the finger at him and say that he is the man that's responsible for this with such certainty and with such definite--definitiveness in her testimony, if she's not to be believed it must mean that she's framing him for some reason, and don't you think we'd have heard some cross[-]examination about a motivation for her to lie about his--about his--about motivation to lie?  Excuse me because I didn't state that real well.  Let me try again. Don't you think we would have heard some cross[-]examination if there were any reason at all for her to make this up and to frame him?"

Defendant objected, and the trial court held a side-bar conference.  After the conference, the trial court reminded the jury that the State has the burden of proof.

The prosecutor later remarked:

"And we know not only that he fled to Missouri, but we know why.  You heard a little bit of testimony about the fact there was a second person in the house that day.  We were never able to determine who it was because Donna said she didn't recognize the man, but the defendant committed this crime, beat her, leaving her for dead in front of a witness.  That's the reason why he ran to Missouri, ladies and gentlemen."

Defense counsel also objected to this statement, and the trial court sustained the objection. 

Finally, the prosecutor commented:

"At least twelve separate brutal, brutal hammer strikes to the face.  The sheer brutality of this crime speaks volumes as to what was in the defendant's mind at the time he committed these offenses."

Defense counsel again objected, and the trial court told the jury to disregard any statements not based on facts.   

When viewed in the context of the closing arguments as a whole and the evidence presented at trial, the prosecutor's remarks were neither improper nor substantially prejudicial to defendant.  Defendant contends that the first comment, regarding Donna's identification of defendant, shifted the burden of proof.  We disagree.  The prosecutor commented on the absence of any evidence that Donna was motivated to lie.  Moreover, even if the prosecutor's remark misled the jury on the burden of proof, the trial court cured the error by contemporaneously reminding the jury that the burden of proof remained with the State.

The second remark of which defendant complains was not improper.  As the State points out, the prosecutor was entitled to comment on the evidence of defendant's flight.  

Finally, defendant contends that the prosecutor's reference to 12 blows of the hammer was not based on evidence because the State's expert witness did not testify that Donna had suffered 12 lacerations.  In light of the evidence presented at trial, we conclude that this remark did not substantially prejudice defendant.  The State's expert witness testified to the existence of nine lacerations, with underlying depressed skull fractures beneath three or four of them.  He also testified that one laceration extended from Donna's forehead to the bridge of her nose and that brain matter had come through one of the lacerations on the side of her head.  In addition, the jury heard testimony regarding the amount of blood discovered at the crime scene and a paramedic's description of Donna's condition immediately after she was discovered.  Given that the jury heard this extensive and graphic evidence on the severity of Donna's injuries and the brutality of the attack, the prosecutor's remark that defendant inflicted 12 blows was not substantially prejudicial.  Again, the court instructed the jury to disregard any statements not based on facts.  

D. Consecutive Sentences

Last, defendant argues that the mandatory consecutive sentencing provision of section 5-8-4(a) of the Unified Code is unconstitutional under 
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63, which was decided while defendant's case was pending on direct appeal.  Specifically, he contends that section 5-8-4(a) violates his right to due process and trial by jury.  We disagree.

We review the constitutionality of a statute 
de
 
novo
.  
People v. Fisher
, 184 Ill. 2d 441, 448, 705 N.E.2d 67, 71-72 (1998).

Section 5-8-4(a) of the Unified Code (730 ILCS 5/5-8-4(a) (West 1998)) provides as follows:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X felony or a Class 1 felony and the defendant inflicted severe bodily injury *** in which event the court shall enter sentences to run consecutively.  Sentences shall run concurrently unless otherwise specified by the court." 

Thus, pursuant to section 5-8-4(a), a trial court must impose consecutive sentences when (1) the defendant commits multiple offenses within a single course of conduct, (2) one of the offenses was a Class X felony, and (3) the defendant inflicted severe bodily injury.  730 ILCS 5/5-8-4(a) (West 1998). 

In 
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  The Court further explained:

"'[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.  It is equally clear that such facts must be established by proof beyond a reasonable doubt.'"  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363, quoting 
Jones v. United States
, 526 U.S. 227, 252-53, 143 L. Ed. 2d 311, 332, 119 S. Ct. 1215, 1228-29 (1999) (Stevens, J., concurring).

Disagreement exists 
regarding the 
meaning of an "increase [in] the prescribed range of penalties" (
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363).  Here, defendant asserts that the "increase" to which 
Apprendi
 refers includes the aggregate years of imprisonment resulting from the imposition of consecutive sentences.  For the following reasons, we conclude that 
Apprendi
 does not support defendant's argument.

The 
Apprendi
 decision clearly indicates that the Court was concerned only with increases in 
the sentencing range for a single, discrete conviction--that is,
 the conviction for which the State sought an enhanced sentence.  
Apprendi
 
focused solely upon the increase in the sentencing range for a particular offense and not the aggregate years of imprisonment to be served as a result of a trial court's imposing consecutive sentences.  
Indeed, the Court recognized that the defendant in 
Apprendi
 could have received consecutive sentences.  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 445, 120 S. Ct. at 2354.  Consequently, 
the cumulative effect of a defendant's sentences, including consecutive sentences, is irrelevant under 
Apprendi
.

Unlike the statute in 
Apprendi
, section 5-8-4(a) does not actually increase any of defendant's 
individual
 sentences.  Here, defendant was convicted of home invasion and armed robbery, both Class X felonies (720 ILCS 5/12-11(c), 18-2(b) (West 1998)).  The statutory maximum sentence for a Class X felony is 30 years in prison (730 ILCS 5/5-8-1(a)(3) (West 1998)).  The trial court's sentences of 15 and 20 years respectively are clearly within the prescribed statutory range.   

Section 5-8-4(a) merely addresses the 
manner
 
in
 
which
 
the
 
sentence
 
for
 
each
 
individual
 
offense
 
is
 
to
 
be
 
served
.  That section has nothing to do with the length of each discrete sentence.  730 ILCS 5/5-8-4(a) (West 1998); see also 
People v. Primm
, No. 1-97-3685, slip op. at 26 (December 29, 2000), ___ Ill. App. 3d ___, ___, ____ N.E.2d ___, ___ (consecutive sentencing affects only the manner in which each sentence is to be served and has nothing to do with the length of each sentence).  Our supreme court made this clear in 
Thomas v. Greer
, 143 Ill. 2d 271, 278, 573 N.E.2d 814, 817 (1991), where it held that when sentences are "made consecutive to one another, a new single sentence [is] not formed."  The 
Thomas
 court supported its holding by noting, in part, that "'[t]he term "consecutive sentences" means sentences following in a train, 
succeeding
 
one
 
another
 in a regular order, with an uninterrupted course of succession, and having no interval or break.'"  (Emphasis in original.)  
Thomas
, 143 Ill. 2d at 278, 573 N.E.2d at 817, quoting 21 Am. Jur. 2d 
Criminal
 
Law
 §552 (1981).  Further, the supreme court has held that the imposition of consecutive sentences does not constitute an increase in penalty.  See 
People v. Wendt
, 163 Ill. 2d 346, 355, 645 N.E.2d 179, 183 (1994).

Moreover, the imposition of consecutive sentences has historically been within the trial court's discretion (See 
People v. Vraniak
, 5 Ill. 2d 384, 386, 125 N.E.2d 513, 515 (1955)), and the factors set forth in section 5-8-4(a) of the Unified Code merely limit that discretion.

The 
Apprendi
 Court was concerned that the New Jersey hate-crime statute gave the trial judge the ability to decide an element of the crime because that statute required the court to make a finding as to the defendant's mental state, 
i.e.
, that he acted out of hate.  Thus, the statute was "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict."  
Apprendi
, 530 U.S. at ___ n.19, 147 L. Ed. 2d at 457 n.19, 120 S. Ct. at 2365 n.19. 

These concerns are not implicated under the mandatory consecutive sentencing provisions of section 5-8-4(a) of the Unified Code.  The findings trial courts make under this section are not akin to additional elements of the crime charged.  Rather, they are the type of considerations that trial courts typically take into account when weighing aggravating and mitigating evidence to determine an appropriate sentence.

Last, in support of our conclusion, we note the recent decision of the Second Circuit Court of Appeals (rejecting an 
Apprendi
 argument regarding the imposition of consecutive sentences), as follows:

"[T]he Supreme Court's concern in 
Apprendi
 was whether the sentencing court had, on the basis of facts found by the court and not the jury, exceeded the sentence for a particular count.  Here, the district court did not exceed the maximum for any individual count.  It cannot therefore be said that, as to any individual count, the court's findings resulted in the imposition of a greater punishment than was authorized by the jury's verdict. [Citations.]

Second, and perhaps more important, we are aware of no constitutionally cognizable right to concurrent, rather than consecutive, sentences."  
United States v. White
, 240 F.3d 127, 135 (2d Cir. 2001).

III. CONCLUSION

Accordingly, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH and COOK, JJ., concur.